# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7797 | **DATE** | December 28, 2000 |
| **CASE TITLE** | DELPHINE LYON-SCOTT vs. WILLIAM J. HENDERSON, Postmaster General of the United States | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendant's Rule 56 motion for summary judgment is granted and this action is dismissed. The Clerk of the Court is directed to enter judgment in favor of defendant William J. Henderson, Postmaster General of the United States and against plaintiff Delphine Lyon-Scott.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | DEC 2 8 2000 date docketed | 35 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | IS docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| SN | courtroom deputy's initials | 00 DEC 28 PM 2:04 Date/time received in central Clerk's Office | 12/28/2000 date mailed notice  mqm mailing initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DELPHINE LYON-SCOTT,          )
                              )
          Plaintiff,          )
                              )
     v.                       )     No. 99 C 7797
                              )
WILLIAM J. HENDERSON, Postmaster )
General of the United States, )
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER

Delphine Lyon-Scott ("Scott") has sued United States Postmaster General William J. Henderson (because the Postmaster General essentially serves as a proxy for the government agency that he heads, defendant is referred to here as "Postal Service") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e to 2000e-17 ("Title VII"). Scott contends that by reinstating her former subordinate Gregory Gnau ("Gnau") after an altercation between them that resulted in her issuing Gnau a notice of removal, Postal Services subjected Scott to hostile environment racial and sexual harassment that ultimately forced her to take unpaid medical leave, a sort of "constructive suspension."

Postal Service has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and both parties have complied with this

35

District Court's related LR 56.1.[1] For the reasons stated in this memorandum opinion and order, Postal Service's motion is granted and this action is dismissed with prejudice.

## Summary Judgment Standards

Familiar Rule 56 principles impose on Postal Service the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (St. Louis N. Joint Venture v. P & L Enters., Inc., 116 F.3d 262, 265 n. 2 (7th Cir. 1997)). As Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999) has more recently quoted from Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir. 1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

---

[1] Both sides have submitted statements of material facts pursuant to this District Court's Local Rule 56.1. Scott labels her submissions "Plaintiff's Supplemental Statement of Material Facts Under Local Rule 12(N)" and "Plaintiff's Response Under Local Rule 12(N) to Defendant's Rule 56.1 Statement of Material Facts." But LR 12(N) was superseded by LR 56.1 effective September 1, 1999. This opinion will therefore follow the newer designation (in any event the requirements under the new and old rules are the same). Hence this opinion cites to the Postal Service's LR 56.1(a)(3) statement as "PS St. ¶--" and to what is effectively Scott's LR 56.1(b)(3)(B) statement of additional facts as "S. St. ¶--." Responses to those statements are respectively cited "PS Resp. ¶--" and "S. Resp. ¶--." This opinion also employs the same "PS" and "S." abbreviations in referring to the parties' exhibits.

2

While that general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue (Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (id.). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Postal Service violated Title VII (see Fuka v. Thomson Consumer Elec., 82 F.3d 1397, 1402 (7th Cir. 1996) and cases cited there).

## Facts

Scott has been an employee of the Postal Service since January 1987. In 1996 she was assigned as a Supervisor of Distribution Operations at the Postal Service's mail processing and distribution facility in Palatine, Illinois (PS St. ¶4). Soon thereafter Gnau, who has been diagnosed with high functioning autism due to a head injury and who was placed with the Postal Service through the Illinois Department of Human Services, was assigned to a position as a mail handler under Scott's supervision (id., ¶¶4, 11).

In December 1996 Scott interceded in an altercation between Gnau and another employee during which Gnau hit the other employee with a piece of mail (PS Ex. A). Gnau cursed and yelled at Scott and grabbed her left hand, which she had placed on her neck just under her chin (Scott Aff. ¶22). As a result of that

incident Scott issued Gnau a Notice of Removal from the Postal Service (PS Ex. A). Scott believed that Gnau's actions violated the Postal Service's then-recently-adopted policy of "zero tolerance" for violence or the threat of violence in the workplace, a policy of which all employees (including Gnau) had been made aware (Scott Aff. ¶¶7, 14, 16). Then Acting Manager of Distribution Operations Daisy Ryan ("Ryan") approved the removal (PS Ex. 1).

Gnau filed a grievance contesting his removal on the grounds that it was an unduly severe sanction and was in violation of the collective bargaining agreement. In January 1997 the Postal Service and Gnau's union representatives negotiated an agreement reducing the removal to a long term suspension, returning Gnau to his previous position and warning Gnau that any further such infractions would result in his removal from the Postal Service (Scott Aff. ¶44 and S. Ex. 6). Scott objected to Gnau being reassigned to her unit (Scott Aff. ¶39).[2]

On May 2, 1997 Scott observed that Gnau was not working productively, primarily because he kept leaving his work area (Scott Aff. ¶51). Scott approached Gnau and told him he was "not carrying his weight" (id.). Gnau began cursing at Scott, saying "this is some kind of racial bull shit," "fuck this shit,"

---

[2] This Court has already ruled that Scott's attempt to challenge the decision to return Gnau to work after his December 1996 removal is time barred as a separate Title VII claim.

4

calling her a "racist motherfucker" and accusing her of picking on him because he was a "skinny white boy" (PS St. ¶8, Scott Aff. ¶51). Gnau proceeded to kick a mail container until it was broken (id.). Scott called Ryan, who called security. When two security officers arrived, Gnau attempted to hit one of the officers two or three times (Scott Aff. ¶¶53, 54). Three days later Scott issued Gnau another Notice of Removal based on that incident (Scott Aff. ¶59, PS Ex. B).

Employee Relations Specialist Colleen Kelly ("Kelly") expressed concern to Manager of Distribution Operations Tim Anderson ("Anderson") (Scott's immediate supervisor) that Postal Service had not met its obligations to Gnau under the Rehabilitation Act (S. Ex. B, PS St. ¶10). Anderson decided to refer the matter to Postal Service Senior Area Medical Director Dr. Lillian Weiss so that she could perform a psychiatric fitness for duty evaluation on Gnau before Gnau's termination was approved (id.).

After reviewing a comprehensive psychological evaluation prepared by Gnau's treating psychologist Dr. Jay Einhorn ("Einhorn"), Dr. Weiss concluded that it was not necessary for her to perform her own evaluation. Dr. Weiss issued a report concluding that Gnau's disability, which contributed to his outbursts, could probably be overcome with special accommodations, and she adopted Dr. Einhorn's six recommendations to that

effect, including one that Gnau be reassigned to a new supervisor (PS Ex. C). In making her recommendation, Dr. Weiss was not aware of the December 1996 incident or the details of the May 1997 incident, including the information that Gnau had sworn at Scott and kicked a plastic tub (S. Ex. C).

Anderson, Kelly, Dr. Weiss, Dr. Weiss' supervisor Kathy Dial, Nurse Chris Hoffman, Occupational Health Nurse Administrator Liz Iwanoski, Gnau, Gnau's mother and Gnau's rehabilitation counselor from the Illinois Department of Rehabilitation Services Joe Nelluvelli later held a meeting to discuss Gnau's removal (S. St. ¶171). Scott was not included in the meeting. Based on the information supplied by Drs. Weiss and Einhorn, Anderson decided to allow Gnau to return to work (PS Ex. 1). Anderson testified that he was concerned that neither he nor Scott had been aware of Gnau's medical condition, so that they had not considered what accommodations were appropriate for Gnau, nor had they attempted to provide them (id.).[3] Gnau entered into

---

[3] In Scott's affidavit submitted in support of her response to Postal Service's motion for summary judgment, she swears that she was aware of Gnau's disability and had been instructed how to accommodate it (Scott Aff. ¶¶ 36, 45, 48). Those assertions are at odds with what Scott said during her deposition, where she had testified that she was not aware of the specifics of Gnau's condition or of making any accommodations for it. That disparity calls for the rejection of Scott's later affidavit under the host of cases exemplified by Kalis v. Colgate-Palmolive Co., 231 F.3d 1049, 1055 (7th Cir. 2000). But even if it were otherwise, the affidavit would not create a material issue of fact because it does not suggest that Postal Service had fully considered all of the accommodations necessary to make Gnau a successful employee.

6

a settlement agreement with Postal Service in August 1997 under which it agreed to reinstate him and to implement Dr. Einhorn's six recommendations (id.).

Gnau returned to work at the Palatine facility on August 4, 1997. He was assigned to a new supervisor and was given a new assignment one floor below where Scott worked during the same tour of duty (PS St. ¶14). Upon learning that Gnau was returning to work, Scott requested that either she or Gnau be transferred to another postal facility or to another tour (Scott Aff. ¶75). Kelly told Scott that Gnau had been returned to that particular tour and assignment because his only two friends worked there (Scott Aff. ¶75). Kelly also told Scott (1) that if she wanted to transfer to another facility, she would have to seek to do so through the other facility and (2) that if she wanted to transfer to another tour, she could move from tour 3 to tour 1 but not to tour 2 (id. ¶¶76, 77). Scott refused to transfer to tour 1, which runs from approximately 11 p.m. to 7 a.m. (id. ¶77).

During his first week back at work, Gnau frequently abandoned his assigned work space and came up the stairs to where Scott was working and stared at her or talked to her subordinates, necessitating that she instruct him to return to the first floor (Scott Aff. ¶93). Due to the stress caused her by Gnau's continued presence, on August 8 Scott made a written request to Anderson for a two-month detail to tour 2 (Scott Aff.

7

¶96). Anderson never responded to Scott's request because Scott went on medical leave as of August 9 due to post-traumatic stress disorder and major depression (S. Ex. 15, S. Ex. B). Then Gnau resigned from the Postal Service on October 28 (PS St. ¶15). When Scott learned of Gnau's resignation through friends at the Postal Service, she returned to work as of November 10 (Scott Aff. ¶109).

On October 27, 1997 (one day before Gnau's resignation) Scott filed a charge with the Equal Employment Opportunity Commission ("EEOC"), asserting that Postal Service had discriminated against her on the basis of race and sex when it allowed Gnau to return to duty after the oral and physical altercations between them. After accepting Scott's charge for investigation, Postal Service forwarded its findings to Scott and EEOC. Based on those findings, EEOC determined that an oral hearing was not necessary and issued a detailed Statement of Findings and Recommended Decision in which it recommended a finding of no discrimination. EEOC also issued Scott a Notice of Right to Sue dated August 26, 1999. Scott says she received the Notice on September 2, 1999, and she filed this action on December 1, 1999, just under the 90-day wire.

### Hostile Work Environment Claim[4]

To establish a Title VII hostile work environment claim, Scott must show[5] that Gnau's conduct was severe or pervasive enough to create both an objectively and a subjectively hostile or abusive work environment (<u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993)). <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 787-88 (1998), in reconfirming (and quoting) <u>Harris</u>, sets out the test:

> We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

As <u>Wilson v. Chrysler Corp.</u>, 172 F.3d 500, 510 (7th Cir. 1999) has since put the matter:

> The criterion is not what a reasonable employee is capable of enduring but whether the offensive acts alter the conditions of employment.

---

[4] Neither side's briefs fully address the law applicable to a hostile environment claim or apply that law to the facts presented in the record. But this Court has reviewed the record and finds there are no disputed facts relevant to that claim, so that it is amenable to disposition as a matter of law.

[5] At this summary judgment stage, of course, Scott need not "establish" or "prove" or "show" anything. Instead she must merely demonstrate the existence of a genuine issue of material (that is, outcome-determinative) fact sufficient to defeat Postal Service's summary judgment motion. Although this opinion will nonetheless often employ one of those quoted terms because that terminology is used by the cited cases, this Court has consistently imposed the appropriate lesser burden on Scott in testing her claims.

But there is another issue that must first be addressed. Title VII does not of course provide a federal forum for every dispute between co-workers. To be actionable at all, the offensive conduct must be based on one of the characteristics protected by Title VII (Smith v. Sheahan, 189 F.3d 529, 532-33 (7th Cir. 1999)).

As a threshold matter in that respect, Scott cannot show that she was harassed by Gnau "because of" her sex. Other than the fact that Gnau is a man and Scott is a woman, there is absolutely no evidence that Gnau's outburst in May 1997 and his pestering of Scott during his first week back on the job in August 1997 were at all gender-motivated (see Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 878 (7th Cir. 1999)). That Gnau also "took a swing" at a male security officer (whose race is not in the record) also negates any reasonable inference that Gnau's actions were gender-motivated.

As for Scott's racial harassment claim, Gnau accused Scott of picking on him because *she* is a racist. Although that is not the sort of racial epithet or other race-motivated action that typically underlies a harassment claim, a reasonable jury could find that if Scott had been white Gnau would not have reacted in such an extreme manner to Scott's direction that he "pick up the pace," and hence that Gnau's actions were to some extent racially motivated.

At this juncture, then, Scott's sexual harassment claim drops out but her racial harassment claim goes forward. What follows is a look at the substantive viability of the latter claim.

There is no question that Scott subjectively perceived her work environment as hostile as a result of the harassment. But even if the time-barred 1996 incident is viewed as contributing to the ongoing climate in the workplace, it is a much closer question whether the harassment was sufficiently severe or pervasive to be considered objectively hostile. After the initial 1996 confrontation, Gnau's comments were isolated and relatively mild, being directed at accusing Scott of racism, not at disparaging her race as such. Even so, Gnau's destruction of the tub could be construed as a threat of physical force against Scott, and his subsequent unauthorized presence in her work area and staring at her (especially in the context of the previous incident) could be interpreted as an attempt to continue to intimidate her. In sum, it can fairly be said that there is a question of fact on that point.

But even if a jury were to find Scott's work environment objectively hostile, her claim would nonetheless fail because Postal Service was not negligent in handling the situation. As Hostetler v. Quality Dining, Inc., 218 F.3d 798, 809 (7th Cir. 2000) has recently reconfirmed (citing earlier cases), the test

in cases of co-worker harassment (such as that involved here) differs from that where an employee is being harassed by her supervisor:

> As this is a case of co-worker harassment, [the employer] will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures once apprised of the harassment.[6]

After the May 1997 incident, Postal Service promptly had Gnau removed from the facility, returned him to work only after a psychological evaluation, and gave him a different supervisor on a different floor. Scott attempts to cavil at Postal Service's decision to return Gnau to work (and to return him to tour 3) and at its refusals to transfer her either to tour 2 or to a different facility. But such second-guessing cannot obscure Postal Service's careful review of Gnau's behavior and its calculated steps to curb his outbursts and separate him from Scott. It is not Scott's role to play employer and to dictate the measures to be taken--instead, Postal Service's corrective action met the standard of reasonable likelihood to prevent the

---

[6] [Footnote by this Court] Scott urges Postal Service's vicarious liability for failing to take appropriate remedial action. Not so, for Gnau was not Scott's supervisor: As taught not only by Hostetler but also by Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir. 1999), quoting Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998), but with citations omitted:

> [W]hile employers are vicariously liable for hostile environment sexual harassment by supervisors, a plaintiff must show negligence in order to hold an employer liable for co-worker harassment.

12

harassment from recurring.

Nor can Postal Service be faulted for failing to prevent Gnau, between the time of his return on August 5 and the commencement of Scott's medical leave on August 9 (even fewer days than the interval found wanting in Hostetler), from leaving his work station on the first floor and going to Scott's work area on the second floor. After all, there is no evidence whatever that Scott notified anyone in management during those few days that Gnau was away from his work area and was disturbing her. It cannot legitimately be argued that Postal Service "should have known" that Gnau was harassing Scott by staring at her and talking to her subordinates.

In sum, Postal Service is entitled to summary judgment on Scott's hostile environment claim. This opinion turns to her remaining claim of a "constructive suspension."[7]

### "Constructive Suspension"?

Scott contends that the unpaid medical leave she took shortly after Gnau was returned to work amounts to a constructive suspension, an issue that our Court of Appeals has not had the

---

[7] "Remaining claim" is not entirely accurate, for Scott also argues at her Mem. 9 that she suffered an adverse employment action in that "her supervisory authority was totally undermined" when Gnau was reinstated. Not only is there no evidence in the record to support that assertion, but that alone would not be the sort of "materially adverse change in the terms and conditions of employment" that constitutes an adverse employment action for Title VII purposes (see Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001-02 (7th Cir. 2000)).

13

occasion to consider. Elsewhere <u>White v. Honeywell, Inc.</u>, 141 F.3d 1270, 1279 (8th Cir. 1998) has held that a jury could find a constructive discharge if the plaintiff proved that both her taking of unpaid medical leave and her ensuing failure to return were caused by the allegedly intolerable working conditions.

This Court is not convinced by existing Seventh Circuit authority that our Court of Appeals would uphold a claim based on the constructive discharge line of cases where a complainant's employment does not actually terminate (indeed, the Eighth Circuit's <u>White</u> case itself involved the actual termination of the plaintiff's employment--as this case does not).[8] But the issue need not be decided here, because it is clear that any assertedly intolerable work conditions that forced Scott to take leave were not a result of any unlawful discrimination on the part of Postal Service.[9] In short, Scott identifies no evidence

---

[8] <u>Simpson</u>, 196 F.3d at 876 recognized a claim based on a constructive demotion, analyzing it under the constructive discharge rubric. But unlike the notion of constructive suspension, in a constructive demotion case the plaintiff's employment in the previous position has ended and has been replaced by lesser employment.

[9] Moreover, Scott's work conditions can hardly be described as sufficiently objectively intolerable to qualify for constructive discharge analysis. As <u>Tutman v. WBBM-TV, Inc./CBS, Inc.</u>, 209 F.3d 1044, 1050 (7th Cir. 2000)(citation and internal quotation marks omitted) recently explained:

> Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking

14

to cast doubt on Postal Service's explanation that it reinstated Gnau because it believed that if did not it would run afoul of the Rehabilitation Act.

Scott points to four things as purportedly raising an inference that Postal Service's true motivation in reinstating Gnau was to discriminate against her on the basis of her sex and race:

1. In other instances where employees were involved in oral or physical altercations with male or non-African American supervisors, the employee was terminated as a result.[10]

2. Postal Service's reinstatement of Gnau was inconsistent with its zero tolerance policy.

3. Postal Service's reinstatement of Gnau was also inconsistent with the "last chance" settlement agreement it had entered into with Gnau after the 1996 incident.

4. Anderson failed to include Scott in the meeting to

---

redress.

Scott's evidence, which is barely sufficient to eke out an issue of fact as to whether she was subjected to a hostile environment, falls far short of that higher standard.

[10] Even if that type of evidence might suffice to create an issue of material fact as to Postal Service's motivations, the contention as to two of the alleged altercations (one between Hughes and Peterson, the other between Lydell and Posada), as well as Scott's assertion that an employee Giren was hired under the Department of Rehabilitation Services program, could not be considered because they are inadmissible hearsay.

15

discuss whether Postal Service was required under the Rehabilitation Act to reinstate Gnau.

But none of those things casts a cloud on the bona fides of management's beliefs that Postal Service had not met its obligations to Gnau under the Rehabilitation Act, that Gnau's outbursts could be controlled if Dr. Einhorn's recommendations were implemented and that it was unnecessary to terminate Gnau or transfer either Gnau or Scott to a different facility or different tour to prevent the harassment from recurring. It is impossible to infer reasonably that Scott's working conditions were affected by any unlawful discrimination against her.

## Conclusion

Scott has introduced no evidence to create a genuine issue of material fact suggesting that Postal Service's reinstatement of Gnau was motivated by discriminatory animus based on her race or her sex or both. Because Postal Service is therefore entitled to a judgment as a matter of law, its Rule 56 motion is granted and this action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: December 28, 2000